Case number 15-3725, United States of America v. David Kraus, Oral Argument Not to Exceed 15 Minutes per Side, Ms. Wolfe for the appellant. Good morning, your honors. I'm Susan Wolfe. I represent David Kraus, the appellant, and I have This case involves the calculation of loss at sentencing where, according to the guidelines, the defendant is entitled to credit for the fair market value of collateral that has not been disposed of at the time of sentencing. There were three categories of collateral in the case. There was land, there was equipment, there was wine inventory, and the FSA, the agency had a security interest in that collateral for loans they had made to Mr. Kraus, Dr. Kraus, to establish and run the winery. With respect to the land, it was the Mason Road property and the defendant produced at sentencing an appraisal from a local appraiser who was familiar with the area. He was not able to find comparable vineyard properties to appraise, so he did the best that he could in the larger local area to find comparables, and it was supplemented by the report of a winery expert, somebody who had for years owned and operated a winery in Pennsylvania and California who judged wine competitions, had extensive publication credentials, and academic credentials. Ms. Wolfe, if I could ask you a question about the land, I think one of the more interesting questions in this case involves the dispute about whether one appraisal or the other did or did not assign any value to the improvements that have been made to seven of the acres since the 2006 appraisal, or if they have that date right. We have some pictures that are not real clear, but not bad, of what this property looked like, and I want you to ignore for just a second the fact that there are a lot of weeds. I'm not particularly personally persuaded, but that weeds make a whole lot of difference. We can see that somebody has put the posts in that support the wires that vines are then trained to grow on, but I don't see any indication whatsoever in any of these pictures that there are actually any vines. Those pictures were taken by the prosecutor the day before sentencing and given to us the day of sentencing. We never knew exactly what part of the property was photographed. There wasn't even an opportunity to determine that. That's all fine and good, but is it your client's contention that there are vines, at least on some of this additional seven acres? Absolutely. Let me tell you the further part of that question, so you can answer it all at the same time. When you plant a new vineyard, you put in a tap root that's called a trunk. That's what has the roots under the soil, and then you graft on whatever grape vines you want to grow from that trunk. It's very possible that there could be trunks on this land, even if we can't see any vines. Tell me what it is that your client claims is actually on this seven acres in question, and where in the record we could go to find any support for that. Two places. One, there are other photographs taken by the local appraiser Stouffer that look very different than those photographs. Those are in the record? Those are in the record attached to his appraisal. I don't think they show what your Honor is asking about. He wasn't a wine expert. The wine expert walked the property. He didn't photograph the property, but he evaluated it. Does he say in his testimony what it is he saw when he walked the property? In other words, here's the bigger sort of point of this question. I can see that there are improvements that have been made to this land just from these pictures, as grainy as they are, but that doesn't mean that it's worth the $10,000 an acre that was used for the other properties where there are wires, posts, drip irrigation systems, tap roots, and vines that have actually grown up and you can see them along the wires. That's two different questions. Well, it's a very specific and detailed question that the government had an opportunity to ask Dr. Carey. We submitted his appraisal. We then submitted his direct by affidavit, and the government did not take the opportunity. He was available by phone to cross-examine him about that. I'm just trying to figure out what you say the record establishes as to what these improvements to this seven acres actually includes. The 2006 appraisal, which the court relied on, was an appraisal of the vineyard at that time where I believe it was seven of the the grapes or the vines had grown up there on the wires and they were producing grapes. I got that. So how does that compare to the additional seven acres that essentially you're complaining your client didn't get credit for? Our evidence of that was the appraisal of Dr. Carey, who walked the about what he saw, but he saw property. I'm going to ask you one more time then I'm going to give up. What do you say the record establishes was on that additional seven acres beyond the posts and the wires? What does the record tell us was on that additional seven acres? I believe the answer is in the appraisal of Dr. Carey where he says that evaluating this property, not the land, what I see on the land and that has been developed on the land, I would appraise it at an additional $240,000. So you're not going to tell me what the record shows he was actually on the land. You won't tell me that or you don't know the answer to that. So the only place I can look then apparently is the affidavit and the pictures attached to the appraisal. Is that where we stand? Pictures attached to the Salfer appraisal and the Carey appraisal, yes. All right, I give up. Let me ask you, one of the key legal factors that's important here is our standard of review. Even if we, our agreement or disagreement with what the court did is not the standard that governs here. We're looking for whether there was clear error. And what appeared to me to be the basis of the court's decision was a credibility determination. And that is very inherently the right of the district court who views all the evidence and sees the witnesses and makes credibility determination. So in light of that, why would the decision that Stauffer and Carey's evaluations were not as credible as Pfeiffer's evaluation where he had both an evaluation of the planted acres at one value and the unplanted acres at another value? Tell me how you can reach the clear error standard that makes this, I think the rule we're looking for, is outside the realm of permissible computations. Because the Pfeiffer appraisal was nine years old. So what we're looking at... Does it matter that he gave a 5% increase to account for increase of value across time? Right. And it was, we had asked the court to give a 10% increase because according to the information that we had presented, that was more in line with how the market had gone. And he did give a 5% increase. So that was a nine-year-old appraisal and it did not account, and Judge McKeague's questions were right on, in the fact that it didn't account for the planting of the seven additional acres. And our evidence of that, again, was that the winery expert appraised it, evaluated it, and determined that those 15 acres had a value of $240,000. So to adopt a nine-year-old appraisal where, and not require even the testimony of the appraiser, was clearly erroneous when the court had before it the appraisal of a local appraiser and a person who is clearly an expert, not an appraiser, an expert... Why do you say not require the testimony of somebody? I mean, it's the obligation or the reward with whatever proofs they want, which can include testimony. Did the district judge preclude somebody from offering somebody some testimony they wanted to offer? No, this was a government appraisal. And in order for the government to take the position that the court should adopt this value, we should at least have had an opportunity to the government didn't produce. Did you subpoena him? We didn't subpoena him. We only learned that the government was relying on these appraisals six days before the sentencing. Did you ask for more time to prepare for the sentencing? I did. And there was a conference call. It was a scheduling call. It was unrecorded, but I don't think the government would contest as an officer of the court. I can tell you I vigorously asked the court to adjourn the sentencing because it would require so much work to evaluate what the government had provided. We had provided our appraisals to the government five weeks before the sentencing, invited them to have the property appraised, bring in their own appraiser, and they didn't take advantage of that. And I see I have seven seconds left, and a big issue in this case is the wine inventory, and it's a legal and factual issue. And it's a two-step process. It is determining loss, whether actual or intended, and then crediting, applying the credit to loss. There was never any question of intended loss in this case. The actual starting point loss was the amount of the unpaid loan. There was no determination of whether there was some portion of that the defendant intended never to repay. What subsequently happened to this wine after the sentencing, do you know? Some of it was sold, and the proceeds were remitted to the government, and much of it still exists, or all of it still exists, and it's not the wine-selling season right now, but will be sold at its fair market value. So the other question that I had for you, so we can get this on the table and then you can address it at least briefly, and then we can talk about it when you come back, and that's the proper loss table. You're all operating from a table that shows you need to get on $150,000 for all this to make any difference, and it looks to me like the correct table for 2014 is $120,000. You looked at the guideline that was online, which is the wrong one to look at. The books don't change until December. We were applying the 2015 guidelines. It's supposed to apply 2014. That's the year of the sentencing, isn't it? We all did, and the government didn't object to it, and the probation department noted in the PSR that these guidelines were pending amendment, and she was applying them. But would that make any difference in your argument? It won't help your argument, will it? If it's the $120,000, you're still at, what, $199,000? Right. It doesn't really make a difference. You're closer to a 12-level enhancement than you are to the 10-level enhancement. Well, it makes $30,000 difference in how much more credit you have to obtain from either the land, the inventory, or the wine. Right. That's right. So think about that, and then whatever thought you have would be useful. Okay. Your Honor, so... Judge Elder, did you have any questions? No, I'm... Well, I probably have a million, actually, but I think many of them have already been addressed. Thank you. All right, you'll have your rebuttal. Mr. Hood? May it please the Court, Noah P. Hood, Assistant United States Attorney for the Northern District of Ohio, appearing on behalf of the Plaintiff's Appellee, United States of America. Your Honors, this Court should affirm the District Court sentence for three reasons. First, the Court employed the appropriate methodology for calculating a reasonable estimate of the fair market value of the collateral to offset against the loss amount. Second, the Court's factual findings, both about the fraud scheme and about the value of the collateral, were not clearly erroneous. Third, it was appropriate for the Court to decide, based on its factual findings, not to award a credit against loss for the value of the inventory collateral, based on the nature of Dr. Krause's fraud scheme. Why wouldn't it be clearly erroneous, at least with respect to the land, if you use an appraisal that has seven acres under cultivation and seven that are not, and then seven more acres get added, but all you add is an inflationary amount? You don't add anything for the improvements that have been made to the additional seven acres of the vineyard, assuming that there really were improvements that have been made. I mean, how can the District Judge, even under clear error, just ignore that? Your Honor, to answer that question, I would say it's based on the last part of that question, which is assuming the improvements were ever actually made. The Court was required to calculate a reasonable estimate of the value of this collateral at the time of sentencing. I got that, but is it a reasonable estimate if he's told there are 14 acres and he uses an appraisal that has seven? Seven acres, including the improvements. Seven acres with the improvements, Your Honor. Seven acres that had been improved, meaning there were vines and grapes. No, Your Honor, it's not clearly erroneous. Your Honor, yes, the Court should take that into account in assessing the fair market value of that land. The additional seven acres? Yes. But where did the Court take that into account? Your Honor, the Court... Through the 5%? I thought the 5% was just to reflect it was a 2006 appraisal and it's being used in 2014. Your Honor, the Court stated on the record that the additional 5% represented an increase in property values over time. The appraisal that it relied on... That's inflation. That's correct, Your Honor. Not for the additional seven acres. I keep saying the same thing. Why is it appropriate to use an appraisal that doesn't reflect the improvements to the additional seven acres, assuming that they actually had been improved? Your Honor, the short answer is it is not clearly erroneous because the Court looked at several appraisals, looked at photographs of the land, and assessed what value, if any, those improvements would have had. Where do we find that in the record? Your Honor, the photographs or... Your Honor, I believe that's not clearly stated in the record. Okay, so let's go back to this additional seven acres without wasting everybody's time on this whole thing. We can see that, assuming the photograph was... This was your photograph, right? Your guy's photograph of these additional seven acres. That's correct, Your Honor. And you can see that there are the posts that support the wires, but you can't see any vines. That's correct. So were there any vines? Your Honor, we have to go off of what is in the record, and based on the photographs, it appears that if there weren't any vines, they weren't fruit-bearing. This is in June of 2015, shortly before the sentencing hearing. Based on what we can see in the photographs, it appears that whatever's on there is not bearing any sort of fruit. I don't understand where you're coming from at all. You can't see anything on the wires. All you can see are weeds. And that's what the district court said. Your Honor, if the question is, where in the record... I'm just saying, you're the government. I'm trying to figure out, do you say there were vines or there weren't vines? I don't care. It doesn't matter to me what the answer is. Just tell me what your position is. Your Honor, there's... The short answer is that there's nothing in the record showing that there are... definitively showing that there are improvements on these additional seven acres. You know there are improvements because you see in the photographs, you've got the posts and you've got the wires. That costs money to put that in. You have to invest that because the agriculture department requires you to raise the vines up so the pickers don't have to bend over to pick the grapes. There's no magic to this. Now we see, there's got to be some value to the posts and to the wires, right? That's correct. The big money is in the vines. So are there vines or aren't there vines as far as you're concerned? Or just tell me you don't know if you don't know. Your Honor, we don't know. Okay. If I can continue in addressing another question that the court had earlier today regarding... The question is where in the record do we see these improvements? Where are we getting to the value that was suggested by Dr. Krause? It's found really in two places. The first is in Dr. Carey's appraisal which contains one page discussing the improvements on the land. The bulk of Dr. Carey's appraisal was an article written about wineries in the Long Island region of New York. It had nothing to do... Ms. Wolfe tells us that there are actually additional pictures of the seven acres attached to that appraisal, if I understood her correctly. Is that right or wrong? That's wrong, Your Honor. Your Honor, the Carey appraisal can be found at page ID 774-820. There are photographs in that appraisal of other wineries in the New York region. It's part of this article that was attached to the appraisal. The portion of the appraisal, if we're going to call it that, dealing with the improvements on the land, the vines themselves, is one page, about three paragraphs, discussing how he reaches this $240,000 increase in value on the land itself. And that is what Stauffer relied on in calculating his appraisal of the improvements on the land. I would note, Stauffer, in his appraisal and in his declaration, stated that he thought that Carey's assessment of the improvements was overstated, and so he decreased it based on talking with another local vineyard owner. He includes, he decreased it from, what, $240,000 by Carey to $215,000? That's correct. And there's a note in it that it appears to value the vacant land at $5,000. Is that, is the vacant land, does that have, is that in the breakdown of the planted versus the unplanted acreage? Your Honor, just so I understand your question correctly, we're referring to the Stauffer appraisal? Yes. It's my understanding that the Stauffer appraisal broke down the assessment based on the value of the underlying real estate and then separately the value of the vines and other improvements upon that real estate. I'm not sure if I'm answering your question. My question is to try to determine whether the vacant land reference in that exhibit relates to the previously unplanted acres or if there's actually some vacant land within the body of the piece of property. Your Honor, my understanding of that is that it relates to the value of the underlying real estate if it were vacant without improvements on it. Not that there is another portion of the real estate that's vacant and unplanted that that's accounted for. All right. Okay. Your Honors, continuing on, the thorny legal issue in this case is whether or not it was appropriate for the court to decide to withhold a credit against loss for the value of the wine inventory. Here the court made factual findings that, yes, Dr. Krause's fraud scheme involved concealment, involved disposal, involved conversion of wine inventories, grapes, juice used to secure its debt with Farm Services Agency. In a previous unpublished opinion, the Sixth Circuit has said that in the Calkins case, that when a court finds that there is concealment, an attempt to permanently deprive the lender of the value of the collateral securing that debt, that it would be appropriate in certain circumstances to deny a credit against loss for the value of that collateral when the court's engaged in... I would agree with you that that's a more problematic area in this case also because what you're doing is assuming effectively no value for that. You're assuming that he intended to prevent the government from getting anything for it. Tell us what has happened in your understanding. Has that wine inventory been sold and what money was made on it? Because part of what we're talking about is how do you value it? Is it more commercially valuable than has been assumed or is it not? So what's happened to it? Your Honor, the short answer is since the sentencing hearing, there have been two restitution payments made that involve what we understand to be proceeds from the sale of wine or wine inventory. The first was made almost immediately after the sentencing hearing, and this related to sales of wine that occurred while Dr. Krause was under investigation. The payment's being held in escrow and paid over after the sentencing hearing. Is that the $42,000 that was not disclosed or is that a different figure? Your Honor, that's a different figure. We understand that to represent $24,000. It was a $24,000 payment that was made shortly after the sentencing hearing, but it represented sales that we believe occurred prior to sentencing. So at some point after detection but prior to sentencing. Well, all he pled guilty to was failing to disclose $42,058 of proceeds. Isn't that correct? That's correct. Your Honor, and to get to the point about why the failure to disclose that $42,000 in sales results in a denial of a credit against loss for the value of the wine inventory, whatever that wine inventory is determined to be valued at. These are sales that simply were not disclosed to the Farm Services Agency. This is collateral that's securing their debt that's being sold out from under their noses without any sort of reporting either on the front end or the back end, which is what Dr. Krause was required to do. You said there was a second sale? Your Honor, there were additional sales that were made after the sentencing hearing. I believe it was approximately $40,000 worth of wine that was sold. We asked for additional documentation regarding, again, this is not in the record, but just so the Court's clear on the issue. We asked for additional documentation reflecting the sales of that wine for exactly the reason that Judge Scranch put forward today, which is to understand what is this worth, if anything. What was the date of the sentencing again? The sentencing hearing occurred on June 22nd and 23rd of 2015. Fifteen or fourteen? I'm sorry, Your Honor? Twenty-fifteen or twenty-fourteen? Twenty-fifteen. Fifteen. And, Your Honor, to be clear, during the hearing, the Court denied a credit against loss for the value of the collateral, but in doing so it also stated if it were to award value. It thought that the appropriate measure of that was that documented in the Andrews appraisal. Now, Mr. Andrews has been an accredited auctioneer since 1971. His credentials are in his appraisal at page ID 824. But he's not a wine seller, right? He's not a wine auctioneer. Your Honor, in his credentials he states that he has had certain experience selling wine and auctions involving winemaking equipment, though he is not a specifically specialist in auctioning off wine. He notes in his appraisal, though, the difficulties with auctioning off wine, including some of the logistics as far as advertising sale, selling it in bulk as opposed to the FSA effectively running a retail operation out of Dr. Krause's winery. The Court stated that the appropriate measure for the value of that collateral, if anything were going to be awarded at all, was approximately $0.50 to $2 per bottle. Now, if we accept at the high end that there are still approximately, the carrier appraisal has approximately 1,600 cases of wine, effectively 19,000 bottles, even if the Court were to apply what it thought the appropriate measure was. That's $2 per bottle times 19,000, the equivalent of 19,000 bottles, not taking into account the value of reprocessing, reblending, or re-bottling this wine. That's still not going to get to the $78,000 that's needed to get Dr. Krause into the next lower sentencing range that was in effect at the time of sentencing. Well, it is enough if he didn't properly get the additional $10,000 an acre for the seven acres that are in dispute as to whether they had been improved and had vines on them. Your Honor, depending on how much the District Court would have awarded for improvements on the additional seven acres. Well, I understand that. Again, the point that I'm making, Your Honor, is that in order for this to, even if the Court were to find that there was some mistake in this process, we had to find a mistake of the equivalent of $78,000 in reaching a reasonable estimate of the value of the various collateral. I see that my time is up. I'm willing to entertain any additional questions the Court has. Judge Batchelder, any questions? No, thank you. All right. Thank you, Mr. Hood. Thank you. Ms. Wolfe, you have your three minutes. Thank you, Your Honors. One of the questions was whether there were photographs attached to the appraisals. No photographs attached to the Cary appraisal, but photographs attached to the Stauffer appraisal. The other comment, I think Judge Strang made, was that he pled guilty to $42,000 in conversion of collateral. He didn't plead guilty to that. He pled guilty to a 1001 violation regarding a statement that he had made to the Farm Services Agency about the filing of a tax return. All of this, all of the discussion of collateral and credit for collateral is relevant conduct. In the description of relevant conduct, I understood it was the $42,000. My understanding is that might help your client because there is other evidence in the record regarding the time period from 2005 to 2011 and 2009 and early 2010 that would show there were much larger sales. My question is, if we're not looking at the $2 million in sales from 2005 to 2011 or the $1 million of sales in 2009 to 2010, is it all that we are talking about in his pleading that it was $42,000 that he failed to disclose, or are we looking at a higher figure? Well, all that we're talking about in the PSI, and the PSI was based on the information given to them by the government, is a failure to disclose $42,000. We made a full presentation on that. We gave the Probation Department a chart, and we said it is at most $23,000 because $19,000 of it, we can't figure out how the government came up with it. And our argument was that that does not show an intent to conceal and deprive the government of $288,000 worth of wine. And also the important, the concealment issue really didn't have anything to do with the wine. Is the confusing part about this that supposedly he didn't report some sales that he had before, I guess, probably before he got indicted? That's different wine than the wine that's in the inventory. The question becomes whether they could prove that he was regularly concealing the sales of wine, and that's why they then exclude all the wine that's in the inventory. I thought that the reason was, or the primary reason was, that when he learned he was being investigated, he started to sell wine to places that had not received a subpoena from the government. He changed the way in which he was distributing the wine in a way the government claims evidences his intention to conceal that from the government. Do I understand that correctly? That's the government's allegation. So what's the response? And that had to do with grapes. He had bulk grape purchasers who he was required to disclose them to the government, the names of those people, and how much he had sold, and how much he intended to sell in the coming year. Wine was different. It was sold from a winery barn. You don't collect identification information from people who buy bottles of wine or order a glass of wine. That information, the government never expected him to disclose. They expected him to disclose the cash register receipts, which he did. Why is it not a fair inference, at least from the government's standpoint, that if he's trying to cheat the government out of the proceeds of the grapes, that he was then presumably going to cheat them out of the proceeds of the wine? That's their argument, isn't it? That's their argument, but when their evidence of that is, and it's disputed, a total of $42,000 over a period of four years, the inference is then not warranted. I see. Okay. Any questions? Judge Batchelder, anything further? No, thank you. All right. Thank you, Ms. Wolfe. The case will be submitted, and we'll look at it carefully. Your Honor, may I just add that this was an expedited appeal, an expedited oral argument because of the length of the sentence, and we hope it will remain on an expedited track. Thank you.